**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**RONALD PALMER HEATH,**

       **Petitioner,**

**vs.**                                  **Case No. 1:09cv148-MCR/WCS**

**WALTER A. McNEIL, Secretary,
Florida Department of Corrections,**

       **Respondent.**

_____/

## REPORT AND RECOMMENDATION

    This is a petition for writ of habeas corpus filed by Ronald Palmer Heath pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges his convictions on December 12, 1990, for first degree murder and armed robbery in the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida, case number 1989-CF-03026-A. He was sentenced to death for the murder.

    Pending is a motion for summary judgment filed by Respondent, seeking a ruling that the petition is untimely. Doc. 14. Petitioner has filed a motion for a ruling that the one year period for filing a § 2254 motion should be equitably tolled. Docs. 43 and 45.

The court appointed new counsel for Petitioner and referred this issue to me for an evidentiary hearing and a report and recommendation.  Doc. 47.

An evidentiary hearing was held on May 5, 2010.  Docket entry 53.  A transcript has not been ordered, and my proposed findings of fact are from my notes during the hearing.  Most of the material facts are not in dispute.  Written final argument was delayed until the Supreme Court decided Holland v. Florida, No. 09-5327.  Doc. 54. The case was decided on June 14, 2010, and the post-hearing memoranda are docs. 56 and 57.

**Findings of Fact**

Robert Harper was retained by Petitioner to file a § 2254 habeas petition in this court following exhaustion of state court remedies.  Mr. Harper was admitted to practice law in 1970, and,  for most of his career, Mr. Harper has been primarily a sole practitioner specializing in criminal law.  He has conducted three to four hundred criminal trials, about 50 of which were in capital murder cases.  He has litigated about 30 federal habeas petitions involving defendants sentenced to death.  In the last 15 years, Mr. Harper has handled 8 to 10 federal habeas petitions.

The parties have stipulated to a "time line" that sets forth the procedural dates relevant to the issue of the timeliness of this § 2254 petition.  R. Ex. 1, Attachment A. The parties agree that the one year period for filing a § 2254 petition in this court, as provided by the AEDPA, expired on April 15, 2009.  Id.  The § 2254 petition here was filed by Harper on June 23, 2009, and the parties agree that it is untimely unless equitable tolling applies.  Id.

The parties also agree that Petitioner wrote and mailed the letters to Mr. Harper which are attached as Attachment C to Respondent's Exhibit 1.  R. Ex. 1, p. 6, ¶ B.1. The parties agree that Mr. Harper wrote and mailed the letters to Petitioner in Attachment D.  *Id.*, ¶ B.2.  The parties stipulate that Mr. Harper sent or received the emails collected in Attachment E.  *Id.*, p. 7, ¶ B.3.

When a letter is received from a client by Mr. Harper's office, a date stamp is manually affixed showing the date that the letter was received.  Then the letter is electronically scanned and preserved as a digital image file, and the scanning process places the date of scanning on the letter.

On March 6, 2008, Petitioner wrote to Mr. Harper.  R. Ex. 1, Attachment C-3.  Mr. Harper received the letter on March 13, 2008.  *Id.*  Petitioner noted that the United States Supreme Court had denied certiorari in his case on March 24, 1997, and said that he was aware of the enactment of the AEDPA, which provided for a one year period in which to file a § 2254 petition in federal.  *Id.*  He asked Mr. Harper "how much time do I have left to file a Habeas Corpus in Fed. Court?"  *Id.*  He also asked Mr. Harper if he was aware of this one year period.  *Id.*  There is no evidence that Mr. Harper responded to this letter.

On February 3, 2009, a year later, Mr. Harper wrote to Petitioner enclosing a copy of the Florida Supreme Court's decision affirming the denial of Petitioner's Rule 3.851 motion.  R. Ex. 1, Attachment D-2.  Mr. Harper said he was sorry for the bad news, and would "be in touch."  *Id.*

On February 9, 2009, Petitioner wrote to Mr. Harper.  R. Ex. 1, Attachment C-5. The letter was received by Mr. Harper on February 16, 2009.  *Id.*  Mr. Harper testified

that he remembered receiving and reading this letter. Petitioner wrote Mr. Harper that he had received the Florida Supreme Court's ruling affirming the denial of Rule 3.851 post conviction relief. *Id.* Petitioner said that although Mr. Harper had told him he would be in touch, Petitioner did not know what that meant. *Id.* He asked if Mr. Harper would "re-file with the FSC [Florida Supreme Court]." *Id.* Several pages of the letter then discussed the evidence provided by Petitioner's brother about the murder and continued Petitioner's complaints voiced in earlier letters (Exs. C-1 through C-4) about the representation he was receiving from Mr. Harper. *Id.* In the next to last paragraph, Petitioner wrote:

> You never did answer my question about how much time I have to file –
> was it a Habeas Corpus. I am probably time barred by now! <u>All</u> because
> of my brother's lies? (Well, of course, I'm partly to blame.)

*Id.* Petitioner concluded by asking how much time was available to file for a re-hearing in the Florida Supreme Court. *Id.* Mr. Harper did not reply to this letter in any way.

On March 10, 2009, Petitioner again wrote to Mr. Harper, and Mr. Harper received the letter on March 16, 2009. *Id.*, Attachment C-6. Petitioner said he was told some days earlier by "Guisi" Branca that the motion for rehearing in the Florida Supreme Court had been denied. *Id.* He explained his understanding that once the case was closed in the Florida Supreme Court, the records are returned to archives. *Id.* Petitioner wrote:

> That – <u>if</u> – you intend to continue on my case, you must notify (and
> possibly petition) the Federal Court. That the Federal Court must appoint,
> or approve you to continue to represent me.

*Id.* Petitioner also said that he was beginning to feel "a bit frantic" because rehearing had been denied and he still had not been "informed by my attorney." *Id.* Petitioner

explained that he had no idea what is going on, and he was "aware of the fact that my time is ticking. Any mistakes, are paid for by me, and noone [sic] else." *Id.* Petitioner asked Mr. Harper to contact him immediately. *Id.* There is no evidence that Mr. Harper replied to this letter in any way.

On March 18, 2009, Petitioner wrote to Mr. Harper and the letter was received by Mr. Harper on March 23, 2009. Attachment C-7. Petitioner said that he had "received your message through Giusi" and truly appreciated "you responding to her, as you have."[1] *Id.* Petitioner did not mention in this letter that Ms. Branca had told him that he had 30 or 32 days in which to file the § 2254 petition. Petitioner requested a telephone conference with Mr. Harper. *Id.* Mr. Harper did not reply to this letter in any way.

On April 8, 2009, Petitioner wrote again to Mr. Harper requesting a telephone conference. Attachment C-8. The letter was received by Mr. Harper on April 13, 2009, two days before the time for filing the § 2254 petition would expire. *Id.* Petitioner stated in this letter:

> Sir, since the FSC has ruled on my appeal, I have written to you, four or five times, asking for a phone call with you – or to be filled in. My last letter was two and a half weeks ago.
>
> I would not pester you, if I was aware of what was going on. But, at this point, I do not even know if I am being represented. And, if so, what your plan is. I don't know if you are aware of the new rules governing The Federal Appeal process – (since 1996). [O]r not.
>
> I'm completely in the dark, and I am receiving <u>no</u> answers. <u>No</u> response to my inquiries. I need to know if I am not being represented, do <u>I</u> need to petition the JAC, or someone else, to appoint an attorney – before I am Time Barred from proceding [sic] further – (if I am not, already!)

---

[1] As will be discussed ahead, Ms. Branca and Ms. Dorman had met with Mr. Harper on Petitioner's behalf.

*Id.* Mr. Harper did not communicate with Petitioner in any way in reply to this letter. Mr. Harper testified that he did not tell Petitioner on April 13, 2009, (when he received this letter) that he intended to miss the filing deadline, or that he thought that he had already missed the deadline.

Janet Dorman testified. She is a retired nurse living in Ireland, is a United States citizen, and has taken an interest in Florida death row prisoners, trying to help them with their living conditions. She said that on February 20, 2009, she came to Tallahassee, Florida, with Giuseppina Branca, whom she had met in Starke, Florida. She said that Petitioner and Ms. Branca were very concerned about how his case was proceeding. She testified that she and Branca met with Harper in Tallahassee, and Harper told them that while the case was not going well, time was of the essence and he was "on top of it." Ms. Dorman testified that Harper told her and Branca that Petitioner had 32 days in which to file the federal appeal after state proceedings ended.

Giuseppina Branca testified that she lives in Holland. She first met Petitioner in 2002 in her work with Amnesty International.[2] She said that Petitioner was worried about his case, and asked her to talk with Mr. Harper in Tallahassee. She said that Petitioner kept talking and worrying about a time frame, and that time was "ticking" on his case. She said that she went to Tallahassee and met with Mr. Harper. Mr. Harper told her that Petitioner had 30 days after everything in state court became final in which to file the federal case. Ms. Branca said that she felt comfortable after the meeting that Mr. Harper was doing something on the case.

--------

[2] See Ex. F-1, Affidavit of her husband, Robert Van Der Lande, ¶ 1.

Mr. Harper acknowledged that he met with Dorman and Branca and explained to them what "was going on."  Mr. Harper denied telling them that he had 32 days in which to file the § 2254 petition.  Mr. Harper testified that he does not discuss the substance of a case with a family member or a friend.  As will be discussed ahead, Mr. Harper had made a note on his calendar to file this § 2254 petition on March 30, 2009, so when he met with Dorman and Branca, Mr. Harper knew he had a fast approaching deadline.

I conclude at this point that while Mr. Harper did meet with Ms. Dorman and Ms. Branca, he did not tell them of the number of days that he thought that he had to file the § 2254 petition.  Had he done so, Ms. Dorman and Ms. Branca would have passed on that critical information to Petitioner, and Petitioner would have specifically mentioned the number of days left to file in his letters of March 10, 2009, March 18, 2009, and April 8, 2009.  These letters reveal that Petitioner was then frantic about the deadline.  Had he been told by Harper (through Branca and Dorman) the precise number of days to file, he could have calculated the deadline himself and known that the date was April 15, 2009.  Petitioner did not mention the number of days remaining or the presumptive deadline in his March and April letters, and this leads to the conclusion that this specific aspect of the testimony of Ms. Dorman and Ms. Branca is not credible.  But there plainly was a meeting with two of Petitioner's friends, and Mr. Harper plainly sent a message to Petitioner through Dorman and Branca, which was received by Petitioner (hence the March 18, 2009, letter), that all was going well and, implicitly, that he (Mr. Harper) would timely file the § 2254 petition.  Indeed, Harper himself had said in his earlier letter conveying the adverse Florida Supreme Court decision that he would be "in touch."

The parties stipulate that Mr. Harper "calendared Heath's federal habeas petition for filing on March 30, 2009," and the relevant calendar page is Attachment G.  R. Ex. 1, p. 7, ¶ B.5.  Mr. Harper testified that he did not know if this was the actual deadline or a "tickle" date, but he intended to treat this as the "drop dead" deadline, and he planned to file the § 2254 petition by March 31, 2009.  Mr. Harper said that he was aware that he did not have much time to file this § 2254 petition following the finality of the appeal of the denial of Rule 3.851 relief.

Mr. Harper testified that when he and Petitioner attended the state Rule 3.851 evidentiary hearing, he had a young lawyer, Jonathan Kester, working on Petitioner's case.  Mr. Harper said that he himself was supposed to act as editor for a future § 2254 petition, and Mr. Kester was supposed to prepare the petition, but Mr. Harper said that "the buck stops with me."  Mr. Harper also testified, however, that Mr. Kester left Harper's employment on May 31, 2007, the date of Kester's last pay check, and now is in Atlanta.  Harper said that Mr. Kester came "back in off and on without a formal time sheet."  Thus, there was some confusion in the evidence as to when Mr. Kester was no longer available to prepare this § 2254 petition.  Mr. Harper said, however, that when Mr. Kester left, he (Mr. Harper) assumed responsibility for Petitioner's case and admitted as much by saying that the buck stopped with him.

Mr. Harper testified that there was no doubt that he missed the date for timely filing this § 2254 petition.  Mr. Harper testified that he was conscious he had not filed a petition on March 30, 2009, the date he thought was the deadline.  At another point, Mr. Harper testified that he "knew a date was out there" and he knew that he had missed the date.  He said he did not intend to make this a test case, but his thinking was that

the system of justice would not allow the execution of a person with a colorable claim of innocence. Mr. Harper did not explain in his testimony what his theory of a "colorable claim of innocence" was. He admitted that the order denying Rule 3.851 relief was "bullet proof" because Judge Robert P. Cates, the Rule 3.850 state circuit judge, had found that the testimony of Petitioner's brother, Kenneth Heath, as to the order of the wounds inflicted upon the victim (the evidence purportedly demonstrating Petitioner's innocence of the death penalty) was factually not credible, and he knew that fact-finding by the state court would be given considerable deference by this federal court. It is noted here that the § 2254 petition as eventually filed, Doc. 1 and P. Ex. 2, did not make a claim of actual innocence or of newly discovered evidence.[3] The petition presented ineffective assistance of counsel grounds based upon the evidence from Kenneth Heath, but these claims arose from evidence already known and litigated at the Rule 3.851 stage. *Id.*, pp. 7-9, 9-11 (ineffective assistance of counsel grounds one and two).[4]

Mr. Harper testified that was working on this petition for some time every day. Mr. Harper testified, however, that the earliest that he started to draft this § 2254 petition was April 28, 2009. Mr. Harper said that in his judgment, he had a petition that was

---

[3] When asked on the form to explain why § 2244(d) (AEDPA one year period of limitations) did not bar the petition, Mr. Harper wrote: "Claim made by witness one year of finality; state procedural action preceded earlier filing, made within one year of newly discovered evidence of claim." Doc. 1, p. 36. There was no claim here of actual innocence, and the newly discovered evidence argument was only that the *state* "procedural action," presumably the Rule 3.851 motion, was filed within one year of newly discovered evidence.

[4] Indeed, these ineffectiveness claims had to have been known and litigated in state court to be presented to this court. § 2254(b).

borderline frivolous. Mr. Harper testified that he could not pull together arguments to make a claim not already ruled against Petitioner "on all fours." He testified that he thought that Petitioner would be "in successive territory" if he had filed the petition. He reasoned that if a second petition were to be rejected as successive, Petitioner would be in a situation no worse than he is now. Mr. Harper testified again that he thought that March 30, 2009, was the deadline, but he decided that the § 2254 petition at that time was not fit to file. Mr. Harper decided not to file a § 2254 petition on time, as he understood the deadline. Mr. Harper admitted that he did not call Petitioner to tell him that he intended not to file the petition on time.

The trial court's ruling denying the Rule 3.851 motion, and the Florida Supreme Court's findings affirming that decision on appeal, will be set forth here as those decisions are collaterally relevant to this court's findings of fact.

In the order denying the Rule 3.851 motion, Judge Cates said as to ground one that even if Petitioner's brother, Kenneth Heath, had testified at the penalty phase as he did at the Rule 3.851 evidentiary hearing, his testimony would not have helped because it would have revealed two additional penalty aggravators not previously considered by the court and jury: that before Petitioner and his brother left the bar, they planned to take the victim to the woods to rob him and then kill him to avoid a witness. Doc. 3, p. 37 (order, p. 12).

Ruling on the second claim of ineffectiveness of trial counsel, the court concluded that even if Kenneth Heath's new testimony were to be believed, it would "unquestionably" establish that Petitioner was a principal to first degree premeditated murder and first degree felony murder. *Id.*, p. 41 (order, p. 16). The court said:

> Kenneth's "recanted" testimony demonstrated both a pre-arranged plan to
> kill Mr. Sheridan and the defendant's active involvement in bringing about
> Michael Sheridan's death.  The defendant's allegation [based upon the
> new testimony from Kenneth Heath] that three gunshot wounds were the
> sole physical cause of Michael Sheridan's death does not in any way
> detract from the defendant's blameworthiness for this murder.

*Id.*  The court further pointed out that Kenneth Heath testified at the evidentiary hearing

that it was Petitioner's idea to rob the victim, Sheridan, that Petitioner selected the

location, and that Petitioner told Kenneth Heath to shoot the victim; thus, reasoned the

court, this "recanted" testimony would not have diminished Petitioner's liability for felony

murder.  *Id.*, p. 43 (order, p. 18).  The court said that Kenneth Heath had testified that

Petitioner had told him "shoot him again, shoot him again."  *Id.*  The court concluded:

"Even if Kenneth Heath's act in shooting Michael Sheridan was the sole physical cause

of his death, the evidence of Heath's major and active participation in the robbery and

his exhortations to this brother to 'shoot him', prove his guilt, as a principal, of felony

murder."  *Id.*, p. 44 (order, p. 19).

Ruling on the third claim, that newly discovered evidence (the "recantation" by

Kenneth Heath) warranted a new penalty phase, the state court found that Kenneth

Heath's new testimony as to the order of the wounds inflicted upon the victim was not

credible.  *Id.*, p. 45 (order, p. 20).  The court reasoned that the testimony was

inconsistent with the medical examiner's evidence, that death was caused by a gunshot

*and* a sharp force injury to the victim's neck.  *Id.*, p. 21 (order, p. 21).  Second, the court

concluded that though Kenneth Heath now testified that the victim was dead when

Petitioner cut and stabbed his throat, he did not recant his previous testimony that the

victim was making noises at the time that Petitioner tried to cut his throat.  *Id.*  He

merely said that he could not say whether the sounds he heard from the victim were "swallowing sounds, or what." *Id.* Third, the court found that Kenneth Heath had a motive to lie because their mother did not want to see Petitioner die. *Id.*, pp. 46-47 (order, pp. 21-22). Finally, the court found Kenneth Heath not credible because he also insisted that he told the truth at trial, and that someone "must have altered the transcripts of his trial and deposition testimony." *Id.*, p. 47 (order, p. 22). The court concluded, much as it did above as to ineffectiveness of counsel, that even if Kenneth Heath's testimony were credible, it established two new aggravators and a death sentence still would have resulted. *Id.*, p. 48 (order, p. 23).

These rulings were affirmed on appeal. In particular, the Florida Supreme Court found:

> The record here demonstrates that Heath spearheaded the events that led to the murder of Sheridan. While at the Purple Porpoise, Heath suggested that he and Kenneth rob Sheridan. Once they were at the remote site, Heath told Kenneth to retrieve a gun from the vehicle. Once Kenneth shot Sheridan in the chest, Heath removed Sheridan's jewelry, wallet, and watch. When Sheridan failed to respond to inquiries by Heath, he kicked Sheridan. Heath then urged Kenneth to shoot Sheridan to make sure he was dead. After Kenneth shot Sheridan in the head, Heath urged, "Shoot him again, shoot him again." After Sheridan was dead, Heath and Kenneth moved the body further into the woods so that it could not be discovered. Heath unquestionably aided, abetted, and procured the murder of Sheridan. We conclude that even if Heath received a new trial, Kenneth's recanted testimony is not of such nature that it would probably produce an acquittal of Heath or even a conviction on a lesser charge.
>
> We further conclude that Kenneth's testimony is not of such a nature that it would probably produce a life sentence recommendation. The two aggravators found by the trial court in the sentencing order were (1) Heath had been convicted of a prior violent felony (second-degree murder), and (2) the murder was committed during the course of an armed robbery.

*See Heath*, 648 So.2d at 663.[5]  With regard to Heath's prior murder conviction, Detective Gerald Parker testified during the trial about the injuries sustained by the victim, Michael Lee Green. Green's body was found approximately 250 feet from a severely burned vehicle.  Green had sustained twenty-three stab wounds and his skull was crushed.  The apparent weapon used to inflict the damage to Green's skull was a burned tree stump which was covered with dried blood and matted hair.

The sworn statement of Heath with regard to the murder of Green was read to the jury.  In that statement, Heath testified that he stabbed Green because Green made unwelcome sexual advances toward him.  When Green asked for help after the stabbing, Heath told him to get in his (Green's) car and Heath would drive him to the hospital.  However, Heath instead drove the car around and eventually returned to the site where the stabbing occurred.  Heath then set the car on fire while Green was inside and leaned on the door to prevent Green from escaping.  However, Green did manage to exit from the other side of the vehicle.  While Green sat on the ground, watching his car burn, Heath started kicking him.  The two struggled, and Heath proceeded to stab Green in the chest and in the back.  When Green grasped Heath's leg, Heath grabbed the stump and struck Green with it three times.  Heath then dragged Green's body into the bushes.

Kenneth's recanted testimony does not disprove either of the aggravators found by the trial court in its sentencing order.  Indeed, as noted in the order denying postconviction relief, the recanted testimony actually establishes two additional statutory aggravating circumstances:  the murder was committed to eliminate a witness and was cold, calculated, and premeditated.  Given the disturbing facts of the Green murder, which was committed by Heath when he was sixteen years old, and the additional evidence that (1) Heath and Kenneth discussed killing Sheridan even before they left the Purple Porpoise, and (2) Heath appeared to be "in ecstasy" when he sawed at the throat of Sheridan's dead body, we conclude that Kenneth's recanted testimony is not of such a nature that it would probably produce a life-sentence recommendation for Heath.

3 So.2d at 1025-1026.

From the evidence at the hearing and the two state opinions, two factual

conclusions should be drawn.  First, Petitioner knew about the one year federal period

of limitations, repeatedly asked Mr. Harper to advise him about that legal issue and the

---

[5] Heath v. State, 648 So.2d 660 (Fla. 1994).

status of his § 2254 petition, and Mr. Harper repeatedly failed to communicate with Petitioner or to provide legal representation to him about these questions. Second, Mr. Harper calculated and knew the deadline,[6] set a date on his calendar to file the petition, found no nonfrivolous grounds to raise on behalf of Petitioner, decided not to file the petition on the deadline and therefore intentionally did not file on the deadline, and intentionally failed to tell Petitioner about his decision not to file before the deadline or to discuss his decision until long after the fact.

Before leaving the evidence, I note that Petitioner did not testify and he did not authenticate the letters he purportedly sent to Mr. Harper and contained in Exhibit H. It is possible, even probable, that Petitioner fabricated these letters after the fact because Mr. Harper, who date stamps and scans all letters received by his office, had no evidence of having ever received them. However, the letters and contacts Petitioner did have with Mr. Harper are uncontested and have been fully discussed above, so as a general proposition, Petitioner's credibility about his concern about the AEDPA deadline and his attempts to obtain legal advice from Mr. Harper is not an issue. An attempt to fabricate evidence could, in an appropriate case, weigh in as important evidence since one with unclean hands cannot ask for equity. But here, Petitioner made no attempt to authenticate the letters and, in effect, abandoned that evidence. Respondent made no attempt to prove the circumstances of the letters to show fabrication. And the letters in Exhibit H, even if validly written by Petitioner and not fabricated, add little to what Petitioner already wrote to Mr. Harper in the letters discussed above. I conclude that

---

[6] It is immaterial here whether Mr. Harper thought that the deadline was on March 30, 2009, March 31, 2009, or the actual date, April 15, 2009.

the letters contained in Exhibit H have no bearing on the issue to be decided by the court.

**Legal Analysis**

In <u>Holland v. Florida</u>, 539 F.3d 1334 (11th Cir. 2008), Petitioner Holland sent two letters to his attorney, Collins, while the appeal from denial of his state post conviction motion was pending, inquiring about the status of his post-conviction appeal and expressing his concern about the timely filing of a federal § 2254 petition. 539 F.3d at 1337. His lawyer did not answer the letters. *Id.* On November 10, 2005, the Florida Supreme Court affirmed the denial of post conviction relief. *Id.* The mandate issued on December 1, 2005. *Id.* Unaware of this decision, Holland wrote to his lawyer a third time, on January 9, 2006, asking about the status of his state appeal and the future federal habeas petition. *Id.* Holland learned of the Florida Supreme Court's decision on January 18, 2006. *Id.* Holland's attorney did not reply to the third letter, but Holland telephoned him the next day, on January 19, 2006. *Id.* Also on January 19, 2006, Holland received a letter from his attorney stating that he planned to seek certiorari in the Supreme Court. *Id.*, n. 6.

Our circuit held that these facts did not warrant equitable tolling. The court noted that the one year period of limitations established by the AEDPA (Antiterrorism and Effective Death Penalty Act of 1996) may be equitably tolled if a petitioner can show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing," and said that "[a] truly extreme case is required." 539 F.3d at 1338, quoting <u>Lawrence v. Florida</u>, 549 U.S. 327, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007). The court reiterated earlier rulings

that "attorney negligence is not a basis for equitable tolling." *Id.*, at 1339, citing, *inter alia*, Sandvik v. United States, 177 F.3d 1269, 1271-72 (11th Cir.1999). The court cited other cases for the rule that an affirmative misrepresentation by counsel as to the federal habeas limitations period *is* the kind of attorney misconduct that could warrant equitable tolling. *Id.*, discussing Downs v. McNeil, 520 F.3d 1311 (11th Cir. 2008) and two unpublished decisions. The court pointed out that Holland made no allegations of "knowing or reckless factual misrepresentation or of lawyer dishonesty." *Id.* Instead, Holland's lawyer failed to communicate with Holland and failed to file a timely federal petition "despite repeated instructions to do so." *Id.* The court assumed the conduct was negligent, "even grossly negligent," but held that it was not enough for equitable tolling. *Id.* The court concluded:

> But in our view, no allegation of lawyer negligence or of failure to meet a lawyer's standard of care – *in the absence of an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth* on the lawyer's part – can rise to the level of egregious attorney misconduct that would entitle Petitioner to equitable tolling. Pure professional negligence is not enough.

*Id.* (emphasis added).

Recently, the Eleventh Circuit's decision was reversed and remanded for further proceedings. Holland v. Florida, __ U.S. __, 2010 WL 2346549, No. 09-5327 (June 14, 2010). The Court first "join[ed] the Courts of Appeals in holding that § 2244(d) is subject to equitable tolling." 20102346549 at *12.

The Court found "too rigid" the Eleventh Circuit standard that even "grossly negligent" attorney conduct could not warrant tolling absent "bad faith, dishonesty,

divided loyalty, mental impairment or so forth on the lawyer's part."  *Id.*, at *12 (*quoting*

Holland, 539 F.3d at 1339).

> We have previously held that "a garden variety claim of excusable
> neglect," such as a simple "miscalculation" that leads a lawyer to miss a
> filing deadline, does not warrant equitable tolling.  But the case before us
> does not involve, and we are not considering, a "garden variety claim" of
> attorney negligence. Rather, the facts of this case present far more
> serious instances of attorney misconduct.  And, as we have said, although
> the circumstances of a case must be "extraordinary" before equitable
> tolling can be applied, *we hold that such circumstances are not limited to
> those that satisfy the test that the Court of Appeals used in this case.*

*Id.*, at 13 (citations omitted, emphasis added).

> The Court thought:

> The record facts that we have set forth in Part I of this opinion suggest that
> this case may well be an "extraordinary" instance in which petitioner's
> attorney's conduct constituted far more than "garden variety" or
> "excusable neglect."  To be sure, Collins failed to file Holland's petition on
> time and appears to have been unaware of the date on which the
> limitations period expired – two facts that, alone, might suggest simple
> negligence.  But, in these circumstances, the record facts we have
> elucidated suggest that the failure amounted to more:  Here, Collins failed
> to file Holland's federal petition on time despite Holland's many letters that
> repeatedly emphasized the importance of his doing so.  Collins apparently
> did not do the research necessary to find out the proper filing date, despite
> Holland's letters that went so far as to identify the applicable legal rules.
> Collins failed to inform Holland in a timely manner about the crucial fact
> that the Florida Supreme Court had decided his case, again despite
> Holland's many pleas for that information.  And Collins failed to
> communicate with his client over a period of years, despite various pleas
> from Holland that Collins respond to his letters.

> A group of teachers of legal ethics tells us that these various failures
> violated fundamental canons of professional responsibility, which require
> attorneys to perform reasonably competent legal work, to communicate
> with their clients, to implement clients' reasonable requests, to keep their
> clients informed of key developments in their cases, and never to abandon
> a client.  See Brief for Legal Ethics Professors et al. as *Amici Curiae*
> (describing ethical rules set forth in case law, the Restatements of
> Agency, the Restatement (Third) of the Law Governing Lawyers (1998),
> and in the ABA Model Rules of Professional Conduct (2009)).  And in this

case, the failures seriously prejudiced a client who thereby lost what was
likely his single opportunity for federal habeas review of the lawfulness of
his imprisonment and of his death sentence.

2010 WL 2346549, *14.

The Court did not state a "conclusion in absolute form, however," because more proceedings might be necessary. *Id.* "Because the District Court erroneously relied on a lack of diligence, and because the Court of Appeals erroneously relied on an overly rigid *per se* approach, no lower court has yet considered in detail the facts of this case to determine whether they indeed constitute extraordinary circumstances sufficient to warrant equitable relief." *Id.* The Court left to the Eleventh Circuit on remand " to determine whether the facts in this record entitle Holland to equitable tolling, or whether further proceedings, including an evidentiary hearing, might indicate that respondent should prevail." *Id.*

In his concurrence, Justice Alito agreed that the Eleventh Circuit "applied the *wrong* standard," but thought "that the majority does not do enough to explain the *right* standard." *Id.*, at *15 (emphasis in original). He therefore wrote therefore at length "to set forth my understanding of the principles governing the availability of equitable tolling in cases involving attorney misconduct." *Id.*

The tolling question, he said, depends upon agency law,[7] whether the deadline was missed due to "attorney misconduct that is not constructively attributable to the petitioner." *Id.*, at *18. Justice Alito found the issue to be much like the question of

---

[7] An attorney is the litigant's agent, and an attorney's acts within the scope of that representation are treated as those of his client. 2010 WL 2346549, *20 (Scalia, J., dissenting, citing <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 633-634, and n. 10, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

when attorney error is "cause" for a procedural default based on a late filing. *Id.*, *citing*

Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)

(" '[C]ause' under the cause and prejudice test must be something external to the

petitioner, something that cannot fairly be attributed to him"). *Id.* Justice Alito pointed

out that in both contexts, since the attorney is the petitioner's agent, the petitioner must

bear the risk of attorney error. *Id.*[8] He thought that forgetting to file on time (where the

deadline was correctly calculated), or mailing the petition to the wrong address, or

failing to do the research needed to determine the deadline accurately, are all errors

"constructively attributable to the client." *Id.* He thought that even a missed deadline

due to "gross negligence" is not enough, since gross negligence is still not an external

factor imputed to the state. *Id.*, at 17. Justice Alito wrote that allowing equitable tolling

for gross but not ordinary attorney negligence would not make sense, would "be

impractical in the extreme," and would have inequitable consequences. *Id.*

"Although attorney negligence, however styled, does not provide a basis for

equitable tolling," Justice Alito thought the time "may be tolled if the missed deadline

results from attorney misconduct that is not constructively attributable to the petitioner,"

and that Holland had alleged facts showing such misconduct. *Id.*, at *18. Noting in

particular the allegations that counsel abandoned petitioner by his "near-total failure to

---

[8] The majority in Holland noted that in the context of procedural default, it had
stated "without qualification" in Coleman that a petitioner "must 'bear the risk of attorney
error.' " *Id.*, at *12 (citation to Coleman omitted). It distinguished Coleman, a case
regarding federalism, with equitable tolling, which "asks whether federal courts may
excuse a petitioner's failure to comply with federal timing rules, an inquiry that does not
implicate a state court's interpretation of state law." *Id.* (citation omitted). "[G]iven
equity's resistance to rigid rules, we cannot read *Coleman* as requiring a *per se*
approach in this context." *Id.*

communicate," and that petitioner made reasonable efforts to terminate counsel and proceed *pro se*, denied "on the perverse ground that petitioner failed to act through appointed counsel." *Id.* He thought that, "[i]f true, petitioner's allegations would suffice to establish extraordinary circumstances beyond his control." *Id.*

> Common sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of that word. . . . That is particularly so if the litigant's reasonable efforts to terminate the attorney's representation have been thwarted by forces wholly beyond the petitioner's control. The Court of Appeals apparently did not consider petitioner's abandonment argument or assess whether the State improperly prevented petitioner from either obtaining new representation or assuming the responsibility of representing himself.

*Id.* (citations omitted).[9]

Respondent argues that if the court were to find equitable tolling in this case, then in every case of deliberate refusal to file a § 2254 timely petition, the court would find equitable tolling because such a decision "would almost always be indefensible." Doc. 56, p. 16. Respondent argues that such a ruling would improperly allow defendants to delay an execution (by the time of the untimeliness of filing and the time it takes to litigate the equitable tolling question), effectively "commuting" the death sentence for that period. *Id.*, p. 17. Respondent argues:

> If an intentional failure to file is deemed professional misconduct rising to the level of egregious behavior, habeas counsel who wish to give their client the best chance at success, and surely that will be all of them, will have a huge incentive to intentionally miss the deadline.

*Id.*, at 18.

---

[9] Justices Scalia and Thomas dissented. *Id.*, at *19. Both felt that equitable tolling was not consistent with the statute and Congressional intent since the statute already provided four instances delaying the start of the period, and expressly tolls the time when a properly filed state application for collateral relief is pending. *Id.*

This argument is foreclosed by <u>Holland</u>.  The Court clearly envisioned that equitable tolling would be potentially and properly be available to a petitioner if his lawyer did something to erode or destroy his agency relationship with the petitioner, regardless of the lawyer's motive.  Besides, I cannot believe that lawyers who represent defendants in death cases are uniformly so cavalier with their oaths as attorneys that they would routinely refuse to file a timely habeas petition, *in contravention of the client's wishes*, and without telling the client, just to delay an execution for a few months.[10]

Next, Respondent argues that Mr. Harper's decision, though "indefensible," was a reasonable strategic ploy, to buy time.  Doc. 56, pp. 32-36.  Respondent cannot have it both ways.  Mr. Harper might well, in his professional judgment, have believed that Petitioner's claims lacked merit, but a reasonable strategy at that point would have been to talk with Petitioner and move the court for permission to withdraw as counsel, all within the period during which Petitioner still had time to file a *pro se* § 2254 petition.  An intentional refusal to file the case-initiating document within the period of limitations, *and* a refusal to tell one's client, who was clearly interested in a timely filing, is not a "reasonable" strategy.

Respondent suggests that the standard for equitable tolling is whether Petitioner's attorney's "professional misconduct rises to the level of egregious behavior."  Doc. 56, p. 14.  As noted in Justice Alito's concurrence, "it has been aptly said that

---

[10] "I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, *or delay anyone's cause for* lucre or *malice*."  Excerpt from the oath for Admission to The Florida Bar.  It is the thwarting of the client's wishes which distinguishes conduct that may warrant equitable tolling from attorney negligence or other error.

gross negligence is ordinary negligence with a vituperative epithet added."  2010 WL 2346549, at *17.  Egregious, flagrant, gross, these are words of great imprecision and provide no guidance.

Justice Alito's approach, based upon agency law, is very helpful and a sound basis for decision.  As Justice Alito put it, "[c]ommon sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of that word."  Petitioner was led to believe by Mr. Harper that a timely § 2254 petition would be filed.  Mr. Harper told Petitioner that he would be "in touch," and he told Branca and Dorman to tell Petitioner that he had everything under control.  Petitioner knew he had a very short deadline.  During that short period after the Florida Supreme Court affirmed denial of Rul 3.851 relief, Petitioner repeatedly tried to contact Mr. Harper, by letters and through Branca and Dorman.  Petitioner sought legal advice about the filing deadline and tried to encourage Mr. Harper to file the § 2254 petition on time.  Petitioner was diligent.  Mr. Harper did not respond.  Mr. Harper calculated the deadline, knew his time was short, but intentionally refused to file the § 2254 petition.  He also intentionally failed to tell Petitioner that the deadline would come and go without a petition being filed and, as a result, Petitioner was denied the opportunity to file his own timely *pro se* petition.

An attorney may make many subsidiary decisions on behalf of his client without discussing the issues and without obtaining the client's permission.  Initiation of a civil suit within the period of limitations is assuredly not one of them, particularly where the civil suit is Petitioner's only opportunity to obtain federal review of his conviction and sentence of death.  Petitioner is not constructively responsible for Mr. Harper's decision

because Mr. Harper was not operating as Petitioner's agent in any meaningful sense of the word.

Alternatively, if the standard set forth by Justice Alito is not the standard to apply, the facts of this case are even more severe than those in <u>Holland</u>.  After all, the attorney in <u>Holland</u> did not intentionally refuse to file the § 2254 petition within a period of limitations that he had correctly calculated.  Petitioner was equally diligent as Petitioner Holland, albeit for a shorter period of time as the time for filing was so short.  The court should find that the time for filing a petition was equitably tolled from April 15, 2009, until Mr. Harper filed the petition now before the court, and that that petition before the court was timely filed.

Accordingly, it is **RECOMMENDED** that the court find that the AEDPA period was equitably tolled from April 15, 2009, until June 23, 2009, when the petition in this case, doc. 1,  was filed, that Petitioner's *pro se* motions for equitable tolling, docs. 43 and 45, be **GRANTED**, that Respondent's motion for summary judgment, doc. 14, be **DENIED**, and that Respondent be ordered to file an answer.

**IN CHAMBERS** at Tallahassee, Florida, on July 9, 2010.

<u>s/     William C. Sherrill, Jr.          </u>
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**